UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                              CASE NO. 8:20-cr-173-T-23CPT
                                18 U.S.C. § 1349
JONATHAN ROUFFE

**INFORMATION**

The United States Attorney charges:

**COUNT ONE**
**(Conspiracy to Commit Health Care Fraud)**

A.   **Introduction**

At times material to this Information:

The Conspirators and Their Enterprises

1.   The defendant, JONATHAN ROUFFE, covertly and overtly, controlled, owned, held financial interests in, and/or managed multiple durable medical equipment ("DME") supply companies in the Middle District of Florida and elsewhere. DME, here, referred to orthotic devices, meaning knee braces, back braces, shoulder braces, wrist braces, and other braces.

2.   The aforementioned DME supply companies included the following entities: (1) Renovar Stem Cell LLC d/b/a Precision DME ("Renovar"), (2) Healthsource DME, Inc. ("Healthsource"), (3) Decision One

Health, LLC ("Decision One"), and (4) Landmark Medical LLC ("Landmark"). Collectively, these DME supply companies are hereinafter referred to as the "Rouffe DME Fronts."

3. ROUFFE partnered with other conspirators in the control, ownership, and/or management of the Rouffe DME Fronts. Pursuant to such arrangements, ROUFFE shared the revenue—as well as the control, ownership, financial interest, and/or management—of the respective DME fronts with his partner-conspirators.

4. For Renovar and Healthsource, ROUFFE partnered with conspirator R.D. For Decision One and Landmark, ROUFFE partnered with conspirators J.S. and L.G.

5. All of the Rouffe DME Fronts were established by conspirators affiliated with a company called Regency, Inc., which is described next.

*The Regency Faction*

6. Conspirator K.W. owned and operated a company called Regency, Inc. ("Regency") in Largo, Florida, which is within the Middle District of Florida. K.W. and the other individuals who helped operate Regency (including conspirators M.K. and S.P.) are collectively referred to as the "Regency Faction."

7. Regency was a health care billing and consulting company that principally served the DME industry. Regency's consulting services included the creation and sale of "turn-key" DME supply companies to clients, including ROUFFE and the conspirators R.D., L.G., and J.S. As part of this service, Regency generally assisted clients with the accreditation and Medicare-enrollment processes for DME fronts in exchange for a substantial fee of approximately $60,000.

8. In or about March 2018, the Regency Faction incorporated Magic Medical Inc. ("Magic Medical") as a purported DME drop-shipping company in Largo, Florida. Magic Medical was non-operational.

*The Medicare Program*

9. The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Individuals who received Medicare benefits were called "beneficiaries."

10. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS").

11. To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or

"MACs." MACs performed many functions, such as enrolling DME suppliers into the Medicare program and processing Medicare claims. In performing such functions, MACs were assigned to particular geographical "jurisdictions." For DME claims, they were called Jurisdictions A, B, C, and D.

12. Medicare was made up of several component "parts" that covered different items and services. Medicare Part A, for example, covered inpatient hospital stays. Medicare Part B covered, among other items and services, outpatient care and supplies, including orthotic devices, referred to as DME (such as the braces referred to above in paragraph 2).

13. Under Medicare Part B, beneficiaries could only receive Medicare-covered DME from "suppliers" that were enrolled in Medicare.

14. Medicare claims for DME were processed by two MACs: (i) CGS Administrators, LLC ("CGS"), and (ii) Noridian Healthcare Solutions ("Noridian"). Together, CGS and Noridian are referred to herein as the "DME MACs."

*Medicare Part B Enrollment: The Form CMS-855S*

15. A different MAC, Palmetto GBA, LLC ("Palmetto"), handled the enrollment of DME suppliers into Medicare. Palmetto was the single entity responsible for, among other duties, issuing or revoking Medicare

supplier billing privileges for DME suppliers. Palmetto was also referred to as the National Supplier Clearinghouse ("NSC") MAC for DME suppliers.

16. To enroll in Medicare Part B, a DME supplier was required to submit a completed enrollment application—meaning the "Form CMS-855S"—to Medicare. The Form CMS-855S listed many standards necessary to obtain and to retain Medicare billing privileges as a DME supplier.

17. Pursuant to those standards, a DME supplier was required to provide complete and accurate information on the Form CMS-855S and, further, report any changes to such information to the NSC MAC within 30 days. The standards also included the following requirements:

   a. an authorized individual (one whose signature was binding) had to sign the application for billing privileges;

   b. a DME supplier was prohibited from direct solicitation to Medicare beneficiaries;

   c. a DME supplier had to fill orders from its own inventory or, otherwise, was to contract with another company for the purchase of items to fill orders;

   d. a DME supplier had to maintain a staffed physical facility accessible to the public at least thirty hours per week, with visibly posted hours of operation;

   e. a DME supplier had to disclose any person having ownership, financial or control interest in the supplier DME;

  f. a DME supplier could not convey or reassign a supplier number (*e.g.*, the supplier may not sell or allow another entity to use its Medicare billing number); and

  g. a DME supplier had to be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number.

*Owners and Managers of DME Suppliers*

18. The Form CMS-855S required applicants to disclose to Medicare any individual or organization with an ownership interest, a financial interest, or managing control of a DME supplier. This included (i) anyone with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; (ii) anyone with a partnership interest in the DME supplier, regardless of the percentage of ownership, (iii) any organizations with "managing control" over the DME supplier, as well as (iv) any and all "managing employees."

19. "Managing employee" was defined on the Form CMS-855S (and elsewhere) as any general manager, business manager, administrator, director, or other individual who exercised operational or managerial control over, or who, directly or indirectly, conducted the day-to-day operations of the DME supplier. This included anyone under contract or through some other arrangement, whether or not the individual was a "W-2 employee."

20. The Form CMS-855S also called for extensive information regarding those who owned, managed, and/or controlled (financially or

6

otherwise) the DME supplier. This information included the mandatory disclosure of "Adverse Legal Actions," which was defined to include, among other things, any federal or state felony conviction within 10 years.

*Certification by Authorized Official*

21. Finally, the Form CMS-855S required the signature of an "authorized official." The act of signing, or authorizing such signing, bound the DME supplier and official(s) to abide by all "laws, regulations, and program instructions" for Medicare. It also bound and certified the DME supplier and official(s) to the following terms, among others:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[,] including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a–7b(b)[.]
>
> \*\*\*
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*On-Site "BOC" and Medicare Inspections*

22. To enroll in Medicare, a DME supplier was required to complete an accreditation process by an organization approved by CMS. One CMS-approved organization that could perform such accreditation was known as the Board of Certification/Accreditation or the "BOC." The BOC had a set of

standards that a DME supplier had to meet for accreditation, which were tested at on-site inspections and random re-inspections.

23. The NSC MAC also conducted surprise on-site inspections for Medicare enrollment, which helped verify information disclosed in the Form CMS-855S and supporting documents. A DME supplier's responses to the NSC MAC's on-site inspections were recorded, in part, on a Site Investigation for Suppliers of Durable Medical Equipment, Prosthetics, Orthotics and Supplies, Form CMS-R-263. An authorized site inspector would interview staff seeking, among other information, a complete list of all owners and managers and, further, whether they or any of their relatives owned other medical entities.

24. The NSC MAC inspection also involved a review of any on-site DME inventory. A DME supplier that did not maintain its own inventory could be asked to produce a contract with a third-party vendor, such as a DME "drop-shipping" company.

25. Further, the NSC MAC inspection inquired about marketing efforts including, pertinently, direct solicitation or the utilization of any third-party to solicit beneficiaries' referrals via telephone.

26. Finally, all Medicare-enrolled DME suppliers were subject to random re-inspections. During a re-inspection, an inspector could make the

same inquiries noted above, request supporting documentation, and seek follow up information from the DME supplier. Failure to comply could result in the suspension or revocation of Medicare billing privileges.

*DME Suppliers' Unique Identification Numbers: NPIs and PTANs*

27. To bill Medicare, the DME supplier required two unique identification numbers: (i) a "National Provider Identifier" or "NPI," and (ii) a "Provider Transaction Access Number" or "PTAN." To issue NPIs, CMS developed the National Plan and Provider Enumeration System, which assigned NPIs to providers, including DME suppliers.

28. For PTANs, the NSC MAC was the entity responsible for issuing such identifiers to DME suppliers, but only after approving their Forms CMS-855S. With both the PTAN and the NPI, DME suppliers could submit claims and receive payments from Medicare for braces and other equipment.

*DME Claims Submission under Medicare Part B*

29. Claims for DME supplies could be submitted for payment to the MAC through an "Electronic Data Interchange ("EDI") system. EDI was a computer-to-computer electronic exchange of business documents using a standard format. An EDI allowed a DME supplier the ability to transmit Electronic Media Claims ("EMC") to Medicare in a compliant format. Medicare, in turn, required that a DME supplier complete a Common

Electronic Data Interchange ("CEDI") agreement for EDI services with a DME MAC. The CEDI agreement required the DME supplier to agree to several terms and conditions, including:

    a. that it would be responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents;

    b. that it would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so, and certify that required beneficiary signatures, or legally authorized signatures on behalf of beneficiaries, were on file;

    c. that it would submit claims that are accurate, complete, and truthful;

    d. that it would affix the CMS-assigned unique identifier number (submitter ID) of the provider on each claim electronically transmitted to the A/B MAC, CEDI, or other contractor if designated by CMS;

    e. that the CMS-assigned unique identifier number (submitter identifier) or NPI constituted the provider's (or the DME supplier's) legal electronic signature and its assurance that services were performed as billed; and

    f. that it would acknowledge that all claims would be paid from Federal funds, that the submission of such claims was a claim for payment under the Medicare program, and that anyone who misrepresented or falsified or caused to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement was, upon conviction, subject to a fine and/or imprisonment under applicable Federal law.

30. Both methods of filing claims required the submission of certain information relating to a specific patient or beneficiary. The information necessary for a DME claim included:

    a. the type of service provided, identified by an "HCPCS" code (meaning "Healthcare Common Procedure Coding System");

    b. the date of service or supply;

    c. the referring physician's NPI;

    d. the charge for such services;

    e. patient's diagnosis;

    f. the NPI for the DME entity seeking reimbursement; and

    g. certification by the DME provider that the supplies are medically necessary.

31. Further, before submitting a claim for an orthotic brace to the DME MAC, a supplier was required to have on file the following:

    a. written documentation of a verbal order or a preliminary written order from a treating physician;

    b. a detailed written order from the treating physician;

    c. information from the treating physician concerning the beneficiary's diagnosis;

    d. any information required for the use of specific modifiers;

    e. a beneficiary's written assignment of benefits; and

    f. proof of delivery of the orthotic brace to the beneficiary.

32. Finally, under Medicare Part B, providers were not permitted to routinely waive copayments, which were the portion of the cost of an item paid by a beneficiary.

*Proper Telehealth Services for Medicare Beneficiaries*

33. Telemedicine was a means of connecting patients to providers via a telecommunication technology, such as video-conferencing. Telemedicine companies hired physicians and other providers to furnish telemedicine services to individuals. Telemedicine companies typically paid "treating providers" a fee to consult with patients. In order to generate revenue, telemedicine companies typically either billed the Medicare program or other health insurance program, or offered a membership program to patients.

34. Some telemedicine companies offered membership programs to patients who signed a contract for telemedicine services, paid a set dollar amount per month, and paid a fee each time the patient had a telemedicine encounter with one of its providers.

35. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included, among others: (a) that the beneficiary was typically located in a rural area (meaning, outside a "Metropolitan Statistical Area" or in a rural health professional shortage area); (b) that the services were delivered via an

12

interactive audio- and video-telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility—not at home—during the telehealth service furnished by a remote practitioner.

*CHAMPVA*

36. The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health benefit program. CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. CHAMPVA beneficiaries included the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouses or children of veterans who had died from VA-rated service-connected disabilities. In general, the CHAMPVA program covered most health care services and supplies that were medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

### B. The Conspiracy

37. Beginning in or about April 2018, and continuing until in or about April 2019, in the Middle District of Florida and elsewhere, the defendant,

JONATHAN ROUFFE,

did knowingly and willfully combine, conspire, confederate, and agree with with others, including R.D., J.S., L.G., K.W., S.P., and M.K., to commit health care fraud, in violation of 18 U.S.C. § 1347.

### C. Manner and Means of the Conspiracy

38. The manner and means by which the defendant and his conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

    a. It was a part of the conspiracy that ROUFFE and the conspirators R.D., J.S., and L.G. would and did offer and pay illegal bribes through intermediaries—including purported "marketing" companies—to medical practitioners to sign and to prescribe DME brace orders under the guise of "telemedicine." The purported "marketing" companies included Prizm Media Inc., REMN Management LLC, and The Leads Network, LLC.

b. It was further a part of the conspiracy that the purported "marketing" companies would and did electronically transmit, or caused the transmission of, signed DME brace orders, which were secured through illegal bribes (the "illegal DME claims"), to the ROUFFE and his conspirators.

c. It was further a part of the conspiracy that the Regency Faction conspirators and their client-conspirators—including ROUFFE, R.D., J.S., and L.G.—would and did acquire and create numerous DME Fronts located in the Middle District of Florida and elsewhere for the purpose of, among others, spreading illegal DME claims across many entities to evade Medicare scrutiny.

d. It was further a part of the conspiracy that the conspirators would and did conceal from Medicare and others, the true ownership, control, and/or management of the Rouffe DME Fronts. The methods of concealment included:

   i. falsely and fraudulently listing the conspirators' spouses—namely, H.R., M.G., and V.Z.—as sole owners of, respectively, Healthsource, Decision One, and Landmark, on the Form CMS-855S (*i.e.*, the Medicare enrollment application); and

15

        ii.    making or causing to be made false and misleading statements during inspections for and on behalf of Medicare about the ownership and management of the Rouffe DME Fronts.

    e.    It was further a part of the conspiracy that one or more Regency Faction conspirators would and did create, or cause to be created, a fake, non-operational DME drop-shipping company named "Magic Medical."

    f.    It was further a part of the conspiracy that, to dupe inspectors to secure Medicare-billing privileges for the Rouffe DME Fronts, the conspirators would and did:

        i.    execute sham inventory contracts between some or all of the Rouffe DME Fronts and Magic Medical;

        ii.    create bogus patient records for fictitious patients for some or all of the Rouffe DME Fronts; and

        iii.    present, or cause the presentation of, sham inventory contracts, bogus patient records, and other false and misleading information during and in connection with inspections.

    g.    It was further a part of the conspiracy that ROUFFE and conspirators R.D., L.G., and J.S. would not and did not routinely collect copayments from Medicare beneficiaries.

h. It was further a part of the conspiracy that ROUFFE and the conspirators R.D., L.G., and J.S., would and did direct, or cause to be directed, Medicare and CHAMPVA payments for the illegal DME claims to the bank accounts that they could access and control.

i. It was further a part of the conspiracy that ROUFFE and the conspirators R.D., L.G., and J.S., would and did submit, or caused the submission of, over approximately $20,925,182 of illegal DME claims to Medicare and other federal health benefit programs, including CHAMPVA, through the Rouffe DME Fronts, resulting in payments of over approximately $10,725,607; and

j. It was further part of the conspiracy that the conspirators would and did participate in meetings, perform acts, and make statements to accomplish the objects of and to conceal the conspiracy.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE

1. The allegations contained in Count One of this Information are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(7).

17

2. Upon conviction for the violations alleged in Count One, the defendant shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offenses.

3. The property to be forfeited includes, but is not limited to, the $3,127,290 in proceeds the defendant obtained as a result of the commission of the offenses.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

MARIA CHAPA LOPEZ<br>
United States Attorney

By: _____
Kristen A. Fiore
Assistant United States Attorney

By: _____
Jay G. Trezevant
Assistant United States Attorney
Chief, Economic Crimes Section